<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |
|---|---|
| THE ESTATE OF LAURA SEMPREVIVO *et al.*,<br><br>            Plaintiffs,<br>    v.<br><br>ATLANTIC COUNTY, *et al.*,<br><br>            Defendants. | Civ. No. 18-1953(RMB-JS)<br><br>**OPINION** |

APPEARANCES:

Conrad J. Benedetto, Esq.
The Law Offices of Conrad Benedetto
1233 Haddonfield-Berlin Road, Suite 1
Voorhees, N.J. 08043
      On behalf of Plaintiffs

James T. Dugan, Esq.
Atlantic County Department of Law
1333 Atlantic Avenue, 8th Floor
Atlantic City, N.J. 08401
      On behalf of Defendants Atlantic County
      and Warden Geraldine Cohen


**BUMB,** United States District Judge

      This matter comes before the Court upon the motion for summary

judgment by Defendants Atlantic County and Warden Geraldine Cohen

("Atlantic County Defs") (Atlantic County Defs' Mot. for Summ. J.,

Dkt. No. 68; Atlantic County Defs' Brief, Dkt. No. 68-2); and

Plaintiff's Response in Opposition to Atlantic County Defendants'

Motion for Summary Judgment. ("Pl's Opp. Brief," Dkt. No. 82.) For

the reasons discussed below, the Court will grant summary judgment
to Defendants on Plaintiffs' claims under 42 U.S.C. § 1983 and the
New Jersey Civil Rights Act ("NJCRA"), dismiss the John Doe
Defendants without prejudice, and decline to exercise supplemental
jurisdiction over Plaintiffs' state law claims.

I.   PROCEDURAL HISTORY

On March 29, 2017, in Civil Action No. 1:17-cv-02050-RMB/JS
(D.N.J.), Plaintiffs, the Estate of Laura Semprevivo, Ronald
Semprevivo and Patricia Semprevivo ("Plaintiffs"), filed a
complaint arising out of the September 16, 2016 suicide of Laura
Christine Semprevivo at the Atlantic County Justice Facility
("ACJF"). Defendant CFG Health Systems, LLC ("CFG") filed a motion
for summary judgment on August 21, 2017. (Id., Dkt. No. 25.) On
December 5, 2017, the Court dismissed Plaintiffs' claims against
CFG with prejudice. (Id., Dkt. No. 43.) Plaintiffs voluntarily
dismissed the remainder of their claims without prejudice. (Id.,
Dkt. Nos. 41 and 44.)

On February 9, 2018, Plaintiffs filed a complaint in this new
action against Defendants CFG, Warden Geraldine Cohen, Corrections
Officer ("C/O") Louis King, Atlantic County, and John Does.
(Compl., Dkt. No. 1.) On September 4, 2019, the Court granted CFG's
motion for summary judgment. (Order, Dkt. No. 49.) The parties'
filed a stipulation of dismissal as to Defendant Louis King on
April 2, 2019. (Stipulation, Dkt. No. 37.) On April 7, 2020, the

Atlantic County Defendants filed the instant motion for summary judgment. (Atlantic County Defs' Mot. for. Summ. J., Dkt. No. 68.) After extensions of time to respond were granted, Plaintiffs filed their brief in opposition to summary judgment on November 20, 2020. (Pl's Opp. Brief, Dkt. No. 82.)

The complaint contains the following claims against the Atlantic County Defendants[1]: Count I, federal constitutional claim for failure to prevent suicide by failing to train and supervise; Count III, supervisory liability of Warden Geraldine Cohen under 42 U.S.C. § 1983 for failure to prevent suicide by failing to adequately screen, monitor, and house pretrial detainees in a safe environment; Count IV, violation of the NJCRA, NJSA 10:6-1 *et seq.* for failure to prevent suicide by failing to adequately train and supervise staff; Count V, wrongful death under the applicable laws of New Jersey; Count VI, Survival Action; and Count VII, negligence. (Compl., Dkt. No. 1.)

II. UNDISPUTED MATERIAL FACTS

The following material facts are undisputed by the parties. (Atlantic County Defs' SOMF, Dkt. No. 68-1; Pls' SOMF, Dkt. No. 82 at 9-16.)

---

[1] Count II, violation of Laura Semprevivo's Fourteenth and Eighth Amendment rights to health care and safety, is pled only against Corrections Officer Louis King, who has been dismissed by stipulation, and John Doe Corrections Officers, John Does CFG employees, and CFG.

- Laura Semprevivo (hereafter, "Laura") was incarcerated an estimated three or four times between 2011 and 2016. (Pls' Ex. 3, T20:18-21, Dkt. No. 82-3.)[2] Her arrests were all drug related. (Pls' Ex. 2, T29:7-9, Dkt. No. 82-2); (Pls' Ex. 3, T21:2-3.) She was incarcerated in the Atlantic County Justice Facility on September 9, 2016. (Atlantic County Defs' Ex. A, Dkt. No. 68-4 at 1.)

- In her classification questionnaire upon admission to ACJF, Laura stated that she had no prior psychiatric hospitalizations, no prior suicide attempts, and she was not currently thinking of suicide. (Atlantic County Defs' Ex. A, Dkt. No. 68-4 at 1.)

- On September 9, 2016, Laura underwent a health evaluation, which revealed she used heroin and benzodiazapines. (Atlantic County Defs' Ex. B, Dkt. No. 68-4 at 2.)

- An intake Mental Health Screening and Assessment was also performed upon Laura's intake at ACJF. The assessment showed that the arresting or transporting officers did not believe that Laura was a suicide risk, she had no prior psychiatric history, she did not express thoughts of suicide, she had never previously attempted suicide, and she was not showing signs of depression. It was determined that Laura had no mental health problems and she was approved for general population. (Atlantic County Defs' Ex. C., Dkt. No. 68-4 at 3.)

- Laura was placed on an opiate withdrawal protocol. (Atlantic County Defs' Ex. D., Dkt. No. 68-4 at 4.)

- On September 14, 2016, Laura was found on the floor of her cell after suffering from a seizure. (Atlantic County Defs' Ex. E., Dkt. No. 68-4 at 5.) Although she was cleared for general population (id.,) at the time of her suicide, she was housed in the "medical right" unit at ACJF. (Defs' Ex. G, Dkt. No. 68-4 at 9.)

- On September 16, 2016 at approximately 9:56 P.M.,

---

[2] Unless otherwise indicated, page citations are to the original document. When following the Docket Entry number, page numbers are those assigned by the Court's electronic case management and electronic filing system, CM/ECF.

Medical Officer Richard Andrews was conducting lock down in medical right. He found Laura Semprevivo with a sheet tied around her neck. He called a medical emergency and staff attempted to render lifesaving treatment, and she was taken to a hospital by ambulance. (Atlantic County Defs' Ex. F., Dkt. No. 68-4 at 6.)

- C/O Jeffrey [last name] at ACJF told Laura's brother Robert, who was an acquaintance, that there was a new C/O on duty the night of Laura's suicide. (Pls' Ex. 3, T31-32, Dkt. No. 82-3.)

- According to the deposition of C/O Ryan Nelson, a newly hired officer found Laura hanging in her cell. (Pls' Ex. 6, T25:4-12, Dkt. No. 82-6.)

- C/O Nelson stated that the new officer would have gone to two weeks of in-service training before he started at ACJF. (Pls' Ex. 6, T25:22-23.) C/O Nelson did not know whether the new officer would have been trained in suicide prevention, drug and alcohol abuse issues or other mental health issues. (Pls' Ex. 6, T24:25-T26:17.)

- Warden Geraldine Cohen ordered an internal affairs investigation to be conducted regarding the suicide. The internal affairs investigation was overseen by Sgt. Patrick Robinson. As part of the internal affairs investigation, Laura's classification, medical and criminal files were reviewed, her phone records were reviewed, video was examined, and interviews were conducted. (Atlantic County Defs' Ex. G, Dkt. No. 68-4 at 7-45.)

- Inmate Belinda Tavaras was interviewed on September 17, 2016 at ACJF, the day after the suicide. She was housed in medical right with Laura. Tavaras thought Laura was funny and friendly, but stressed out. She did not think Laura was depressed and never heard her say that she wanted to hurt herself. (Atlantic County Defs' Ex. G, Dkt. No. 68-4 at 10-13.)

- Inmate Tamia Kelley was interviewed on September 17, 2016 at ACJF. She said that Laura was watching movies with her on the night of the suicide and everything was "good," Laura was playing around. Laura had a discussion with Inmate Kimberly Renart in Renart's cell. Inmate

Amanda Santiago also went to the cell. Santiago thought Renart wanted to harm herself so she reported it to the pod officer. Renart was taken out of the pod. Laura then came out to watch television with the other inmates. Laura must have fallen asleep while watching television and decided to go back to her cell for bed. (Atlantic County Defs' Ex. G, Dkt. No. 68-4 at 13-18.)

- Inmate Deborah Dodel was interviewed on September 17, 2016 at ACJF. She said Laura seemed "alright" and that Laura didn't complain about anything. She saw Laura "kidding around" with the guards earlier. (Atlantic County Defs' Ex. G, Dkt. No. 68-4 at 18-22.)

- Inmate Amanda Santiago was interviewed on September 17, 2016 at ACJF. She described Laura as her girlfriend and thought she was acting "perfectly fine." She said that Inmate Renart was really depressed and asking her about how to commit suicide. Santiago went to a C/O and told the C/O about Renart's suicidal ideation. The C/O took Renart out of the unit. Santiago believed that Laura was acting normal because she was talking and laughing like everything was fine. Laura had asked Santiago about Santiago's own suicide attempt over the course of two days but Santiago did not at all think Laura was thinking about her own suicide. After watching TV together, Laura returned to her cell to go to sleep. (Atlantic County Defs' Ex. G, Dkt. No. 68-4 at 22-27.)

- Inmate Kimberly Renart was interviewed on September 17, 2016 at ACJF. Renart acknowledged that she was taken to the transfer station after she became depressed and was talking about hanging herself. (Atlantic County Defs' Ex. G, Dkt. No. 68-4 at 27-33.)

- Kimberly Renart testified in her subsequent deposition that Laura had spoken to her about her drug use and her boyfriend, whom she was worried about losing. (Pl's Ex. 7, T10:8-15, Dkt. No. 82-7.) Laura became sadder the more she spoke about her problems. (T10:25-T11:3.) Although she had no idea Laura was going to commit suicide, Renart tried to get an officer's attention to send somebody to talk to Laura over the course of two or three days. (T11:6-18.) Renart said mental health staff would come in and only speak with them for two minutes. (T11:17-21.) When Renart asked an officer if there was somebody that they could talk to because some of the

girls in her cell were depressed, the officer told her to pick up the phone and call the hotline number that was on the wall. (T12:4-23.) At some point, the phones in the medical unit were not working for a couple of days. (T14:4-7.) Laura was upset that the phones were not working because she could not speak to her boyfriend or to members of her family. (T14:10-24.)

- On September 16, 2016, in cell 4, Kimberly Renart had a conversation with Laura about ways to commit suicide in jail. (Pls' Ex. 7, T14:25-T15:3.) Renart had said that some people take other people's medication or they hang themselves. Laura was upset. She had a lot of questions about death. (T15:12-T16:2-9.) When Renart told Amanda Santiago what they were talking about, Santiago reported it to an officer. (T17:5-7.) Renart told the officer that she was feeling down and she wanted to get someone for Laura to speak to also. (T17:1-18:3.) Renart was handcuffed and taken away. (T17:13-23.)

- Patricia Semprevivo ("Patricia") is Laura's mother. (Defs' Ex. J, Dkt. No. 68-4 at 113.) In her deposition, she acknowledged that Laura was never hospitalized for any type of mental health problem. She believed that Laura loved life and she was not aware of any reason why Laura would want to commit suicide. (T51:1-25; T52:1-17.) To her knowledge, Laura was never diagnosed with depression, bipolar disorder, schizophrenia, or self-mutilation. (T88:7-23.) Laura was incarcerated in ACJF on occasions prior to September 2016, but Patricia was never informed of any concerns about Laura committing suicide. (T90:7-11.) Patricia said she did not speak to any doctor, nurse, or anybody in the medical unit of ACJF in September 2016. (T98:9-13.) She did not have any phone conversations with Laura between her date of arrest on September 9, 2016 through the date of her death on September 16, 2016. (T138:23-25; T139:1-8.) Patricia never visited Laura in the jail during that time. (T139:13-19.) If she had thought that Laura was potentially suicidal, she would have alerted the jail. (T142:3-6.) Patricia was not sure whether any Atlantic County employee could have known that Laura was suicidal. (T152:22-25; T153:1-5.)

- Ronald Semprevivo ("Ronald") is Laura's father. (Defs. Ex. K, Dkt. No. 68-4 at 121.) Prior to September 2016, Laura never seemed suicidal. Her suicide came as a

complete surprise to him and his entire family. (T27:4-T:28-2.) He had no knowledge of any involvement Warden Geraldine Cohen may have had with regard to Laura's custody, nor of any employee of the ACJF who knew or suspected that Laura was suicidal in September 2016. (T34.)

- Robert Semprevivo ("Robert") is Laura's brother. He was never concerned about Laura being suicidal because she was tough. (Defs' Ex. L, T27:7-9.) He never visited Laura at ACJF and never received any phone calls from her when she was there. (T50:6-11.) To his knowledge, she had never attempted suicide, had never talked about suicide, and had never shown signs of being suicidal. (T53:15-21.) He had no knowledge of Warden Geraldine Cohen's involvement in Laura's supervision and was unaware of any facts that would indicate Laura was at risk, physically, mentally, or emotionally while in custody at ACJF. (T56:2-23.)

- The ACJF had Policies & Procedures relating to suicide prevention. (Atlantic County Defs' Ex. G., Dkt. No. 68-4 at 46-111.) This included training in the "Basic Course for County Corrections Officers, Instructional Unit Chapter 3.3 Suicide Prevention."(Pls' Ex. 8, Dkt. No. 82-6.) A relevant policy (IV) states "that all staff are trained in suicide prevention awareness and departmental policy. All suicidal gestures, attempts, or voicing of suicide intention will be taken seriously and will be responded to immediately" and the requisite training for new staff and annual training for corrections officers is described in detail. (Defs' Ex. H, Dkt. No. 68-4 at 81-85.)

- Upon performing an internal affairs investigation, Sgt. Patrick Robinson concluded that "there were no Policy and Procedure, Rules and Regulations violated by any Custody staff" with regard to Laura's suicide. (Atlantic County Defs' Ex. G, Dkt. No. 68-4 at 45.)

- According to C/O Nelson, after attending the police academy, corrections officers receive in-service training once each year for sixteen hours over two days. (Pls' Ex. 6, T14:2-T15:1, Dkt. No. 82-6.) Nonetheless, C/O Nelson could not answer whether he received suicide prevention training each year. (Pls' Ex. 6, T15:13-25, T16:11-13.)

III. DISCUSSION

    A.   <u>Summary Judgment Standard of Review</u>

Summary Judgment is proper where the moving party "shows that there is no genuine dispute as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Daubert v. NRA Group, LLC</u>, 861 F.3d 382, 388 (3d Cir. 2017). The burden then shifts to the nonmovant to show, beyond the pleadings, "'that there *is* a genuine issue for trial." <u>Id.</u> at 391 (quoting <u>Celotex Corp. v. Catrett</u>, 447 U.S. 317, 324 (1986) (emphasis in <u>Daubert</u>)). "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (citing Fed. Rule Civ. Proc. 56(c)). "'[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" <u>Pearson v. Prison Health Serv.</u>, 850 F.3d 526, 534 (3d Cir. 2017) (quoting <u>Lamont v. New Jersey</u>, 637 F.3d 177, 181 (3d Cir. 2011)).

    B.   <u>Plaintiffs' Claims Under 42 U.S.C. § 1983</u>

Plaintiffs assert, in Counts I and III, that the Atlantic County Defendants violated Laura Semprevivo's Eighth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983. Because Laura Semprevivo was a pretrial detainee during the

relevant time period, Plaintiffs' claims fall under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's Cruel and Unusual Punishments Clause. See Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003) ("the Fourteenth Amendment affords pretrial detainees protections "at least as great as the Eighth Amendment protections available to a convicted prisoner[.]")

The Third Circuit has set out several distinct constitutional claims that may be raised when a pretrial detainee commits suicide, including failure to prevent the suicide and deliberate indifference to a serious medical need. Palakovic v. Wetzel, 854 F.3d 209, 224-27 (3d Cir. 2017). The elements of a Fourteenth Amendment Due Process Claim seeking to hold a prison official liable for failing to prevent a detainee's suicide are:

> (1) that the individual had a particular vulnerability to suicide, meaning that there was a "strong likelihood, rather than a mere possibility," that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability.

Palakovic, 854 F.3d at 223-24. "The 'strong likelihood' of suicide must be 'so obvious that a lay person would easily recognize the necessity for' preventative action." Colburn v. Upper Darby Twp., 946 F.2d 1017, 1025 (3d Cir. 1991) (quoting Monmouth County

Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987.) In other words, the risk of suicide must be "sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges." Colburn, 946 F.2d at 1025.

         1.   *Elements of a Monell Claim*

"When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (citing Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978)). "Thus, although the municipality may not be held liable for a constitutional tort under § 1983 on the theory of vicarious liability, it can be held responsible as an entity when the injury inflicted is permitted under its adopted policy or custom." Beck, 89 F.3d at 971 (citing Monell, 436 U.S. at 694). A custom is a course of conduct, though not authorized by law, is so well-settled that it virtually constitutes law. Id. "Liability is imposed 'when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the 'moving force' behind the constitutional tort of one of its employees.'" Thomas v. Cumberland

Cty., 749 F.3d 217, 222 (3d Cir. 2014) (quoting Colburn, 946 F.2d at 1027) (quoting Polk Cnty. v. Dodson, 454 U.S. 312, 326 (1981)).

"Where the policy [or custom] 'concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact.'" Id. (quoting Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir. 1999) (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989) ("Canton"). "[T]he deficiency in training [must have] actually caused" the constitutional violation. Id. (quoting Canton, 489 U.S. at 391.) "To demonstrate 'deliberate indifference' for purposes of failure to train, 'a pattern of similar violations by untrained employees' is usually required." Id. at 223 (quoting Connick v. Thompson, 563 U.S. 51, 62 (2011)). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Connick, 563 U.S. at 62.

"[I]n certain situations, the need for training 'can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights' even without a pattern of constitutional violations." Thomas, 749 F.3d at 223 (quoting Canton, 489 U.S. at 390 n. 10.)) A plaintiff must also establish causation by demonstrating "a

12

causal nexus" between the failure to train and the specific constitutional injury at issue. Id. at 226 (quoting Colburn, 946 F.2d at 1030). "[T]he causation inquiry focuses on whether 'the injury [could] have been avoided had the employee been trained under a program that was not deficient in the identified respect.'" Id. (quoting Canton, 489 U.S. at 391.)

> 2. *Analysis of Failure to Prevent Suicide Claim against Atlantic County*

> > a. There is no disputed material fact as to whether Laura Semprevivo had a particular vulnerability to suicide

To establish Laura Semprevivo's vulnerability to suicide, Plaintiffs point to her heroin addiction, her seizure disorder, her prior arrests, and her conversations with Kimberly Renart around the time of her suicide on September 16, 2016. In Renart's deposition, she stated that Laura was worried about losing her boyfriend, she became sadder as she talked about her circumstances, and they had discussed ways of committing suicide in jail.

The Atlantic County Defendants rely on evidence that Laura's mother, father, and brother each stated in their depositions that they had no reason to believe Laura was suicidal. Furthermore, upon her admission to ACJF in September 2016, Laura completed a classification questionnaire, stating that she had no prior suicide attempts and was not thinking of suicide. Additionally, her mental health screening did not suggest any mental health

problems, suicidal ideation, or thoughts about self-harm. Amanda Santiago, who described Laura as her girlfriend, thought Laura appeared to be fine on the days leading up to and the evening before her suicide. It was Renart who was believed to be suicidal, and ACJF staff took measures to protect Renart from harming herself.

"A particular individual's vulnerability to suicide must be assessed based on the totality of the facts presented." Palakovic, 854 F.3d at 230. Based on the totality of the evidence submitted by the parties here, a reasonable jury could not conclude that Laura Semprevivo's risk of suicide was so apparent that a lay person who had any concern for an inmate's welfare would have appreciated the risk. While a lay person might appreciate that heroin addiction, medical problems like seizures, and a history of arrests are potential factors that could cause suicidal thoughts, Laura did not acknowledge any such thoughts, her family had no reason to think she had ever been suicidal, and most of the pretrial detainees around Laura believed she was feeling well.

Only Renart's conversation with Laura about how to commit suicide and Renart's belief that Laura was depressed may have suggested a risk of suicide. The deposition testimony of other inmates believed that it was Renart not Laura who was at risk for suicide. The facts concerning Laura's vulnerability to suicide simply do not rise to the level required to hold a prison official

liable for failing to prevent an inmate's suicide. <u>Cf.</u> <u>Palakovic</u>, 854 F.3d at 230 (noting pretrial detainee had previous suicide attempts and was nicknamed "Suicide.")

Even if the Court were to assume that there exists a disputed fact over whether Laura Semprevivo had a particular vulnerability to suicide, Plaintiffs must show that Atlantic County was deliberately indifferent to her risk of suicide. Therefore, the Court turns to the elements of a <u>Monell</u> Claim.

> b. <u>There is no issue of disputed fact as to whether Atlantic County was deliberately indifferent to a training deficiency that caused the failure to prevent Laura Semprevivo's suicide</u>

Plaintiffs acknowledge that Atlantic County trained its corrections officers with certain protocols to identify symptoms of an inmate contemplating suicide and provided guidance on how to react in those situations. Plaintiffs' Exhibit 8 is the "Basic Course for County Corrections Officers, Instructional Unit Chapter 3.3 Suicide Prevention." (Pls' Ex. 8, Dkt. No. 82-8.) This training program includes recognizing symptoms of suicide risk and responding to a display of symptoms. Plaintiffs further recognize that Atlantic County created a protocol "Assessment of Suicidal Inmates," which included a mandatory annual training component as well as a training requirement for all new custody staff. (Pls' Ex. 9, Part C. Training, Dkt. No. 82-9.)

Plaintiffs do not identify a deficiency in Atlantic County's suicide prevention training program, but rather, relying on the deposition testimony of C/O Nelson, they contend that the training program may not have been provided for a new employee who was on duty when Laura committed suicide, and the training may not have been provided on an annual basis, as required by ACJF policy. To the contrary, their claims are meritless. Defendants submit that ACJF had policies and procedures relating to suicide prevention in full force and effect in 2016 (Defs' Ex. H, Dkt. No. 68-4 at 46-111), and Sergeant Robinson found no violations of those policies and procedures when he conducted an internal affairs investigation of Laura's suicide. (Defs' Ex. G, Dkt. No. 68-4 at 7-45.)

In his deposition, C/O Nelson testified that the new officer on duty when Laura committed suicide would have had two weeks of in-service training before he started at ACJF. (Pls' Ex. 6, T25:22-33, Dkt. No. 82-6.) Nelson, however, said he could not answer whether the in-service training included suicide prevention or recognizing mental health issues. (Pls' Ex. 6, T25:25-T26:17, Dkt. No. 82-6.) Similarly, Nelson testified that all ACJF corrections officers received in-service training once a year, and that the training included learning about mental health problems and suicide prevention. (T14:15-T15:1-15.) Although Nelson also testified that he did not know whether corrections officers received suicide prevention training every year (T15:20-25), in

the face of the policies and procedures and training programs in force at ACJF in 2016, and the internal affairs investigation revealing no violation of policies and procedures in Laura Semprevivo's suicide death, evidence that C/O Nelson was unsure whether the training program was implemented is not sufficient to establish Atlantic County's deliberate indifference that a training deficiency caused the failure to prevent a detainee's suicide.

3. _Analysis of Failure to Prevent Suicide Claim against Warden Geraldine Cohen_

Although the Court has concluded that a reasonable juror could not find that Laura Semprevivo had a particular vulnerability to suicide, see _supra_ Section III(B)(2)(a), for the sake of completeness, the Court will address whether Plaintiffs raised a disputed issue of material fact as to whether Warden Geraldine Cohen is liable for a supervisory deficiency that led to Laura Semprevivo's suicide. "[T]he mental state necessary for supervisory liability tracks with the mental state required for the underlying tort." Barkes v. First Corr. Med., Inc., 766 F.3d 307, 319 (3d Cir. 2014), cert. granted, judgment rev'd sub nom. Taylor v. Barkes, 575 U.S. 822 (2015). Deliberate indifference is the mental state required for a failure to prevent suicide claim under the Fourteenth Amendment. See Woloszyn v. Cty. of Lawrence, 396 F.3d 314, 321 (3d Cir. 2005) ("because our § 1983 jurisprudence

in custodial suicides borrows the term "deliberate indifference" from Eighth Amendment jurisprudence, "deliberate indifference" may be equivalent to the "should have known" element required for § 1983 liability under the Fourteenth Amendment"); Palakovic, 854 F.3d at 223 (the same deliberate indifference standard applies to Eighth and Fourteenth Amendment failure to prevent suicide claims).

State officials are only liable for their own actions. Barkes, 766 F.3d at 320. Therefore, a plaintiff must

> identify a supervisory policy or practice that the supervisor failed to employ, and then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure. Sample [v. Diecks], 885 F.2d [1099,] 1118 [3d Cir. 1989]; Brown v. Muhlenberg Twp., 269 F.3d 205 (3d Cir.2001).

Barkes, 766 F.3d at 317. A supervisor may also be liable under § 1983 if she participated in violating the plaintiff's rights, directed others to violate them, or had knowledge of and acquiesced in her subordinates' violations. Santiago v. Warminster Twp., 629 F.3d 121, 129 n. 5 (3d Cir. 2010) (citing A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir.2004) (second alteration in original).

18

Plaintiffs' failure to train claim against Warden Cohen fails for the same reasons the failure to train claim fails against Atlantic County, no reasonable juror could find on this record that a known or obvious training deficiency caused Warden Cohen's failure to prevent Laura Semprevivo's suicide. Plaintiffs also assert that Warden Cohen had knowledge of and acquiesced in a subordinate's constitutional violation. Plaintiffs, however, have not established that any subordinate could have prevented the suicide. At most, Plaintiffs speculate that if corrections officers had responded to Renart's requests for someone to talk to Laura about her depression, Laura's suicide might have been prevented. Plaintiffs offer no evidence that Warden Cohen knew about Renart's requests for corrections officers to find someone to talk to Laura. Plaintiffs have not established Warden Cohen's deliberate indifference by knowledge and acquiescence. Warden Cohen is entitled to summary judgment on the supervisory liability claim for the failure to prevent Laura Semprevivo's suicide.

4.    *Analysis of Deliberate Indifference to a Detainee's Serious Medical Need Claims Against Atlantic County and Warden Geraldine Cohen*

The need for mental healthcare to address an inmate's particular vulnerability to suicide may provide the basis for an inmate's constitutional claim under the Eighth Amendment. Palakovic, 854 F.3d at 227. The same standard for Eighth Amendment claims applies to medical care claims brought under the Fourteenth

Amendment by pretrial detainees. See Natale, 318 F.3d at 581 ("the Fourteenth Amendment affords pretrial detainees protections "at least as great as the Eighth Amendment protections available to a convicted prisoner[.]")

> [P]rison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for "an easier and less efficacious treatment" of the inmate's condition. *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978) (quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974)). Nor may "prison authorities deny reasonable requests for medical treatment ... [when] such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'" *Monmouth County Corr. Inst. Inmates*, 834 F.2d at 346 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)). And, "knowledge of the need for medical care [may not be accompanied by the] ... intentional refusal to provide that care." Id. (alterations in original) (quoting *Ancata v. Prison Health Servs.*, 769 F.2d 700, 704 (11th Cir. 1985)).

Palakovic, 854 F.3d at 228.

In opposition to summary judgment for the Atlantic County Defendants on this claim, Plaintiffs state,

> [h]ere, the Defendants completely failed in their obligation to ensure that the Deceased received adequate medical care on September 16, 2016. They should have realized that there was a serious medical need and that the Deceased was depressed and suicidal. Upon entering the Atlantic County Correction Facility on September 9, 2016, the Deceased was at risk for seizures and was on a withdrawal protocol for opiates. Exhibit "10". Moreover, Laura manifested depression and a desire to commit suicide as illustrated from her conversation with Kimberly Renart. This

> expression of a desire was so strong that
> Kimberly Renart sought help from corrections
> officer for Laura - this help never
> materialized. As such, the Atlantic County
> employees were deliberately indifferent to
> Laura Semprevivo's serious physical and
> psychological medical needs. Finally, the
> officer who was in charge of Med Right on the
> September 16, 2016 at the time that Laura
> Semprevivo committed suicide was
> inexperienced.

(Pls' Opp. Brief, Dkt. No. 82 at 30.)

Plaintiffs have failed to address any policy or custom of Atlantic County or Warden Cohen that resulted in a failure to treat a serious medical need of Laura Semprevivo. Plaintiffs acknowledge that Laura was receiving medical evaluation for seizures and treatment for opiate withdrawal. Moreover, the record indicates that Laura denied having any mental health issues when she completed ACJF's classification questionnaire, her medical intake evaluation did not reveal any mental health issues, her family did not believe she had mental health issues apart from addiction, and she did not personally request any mental health treatment at ACJF.

In sum, Plaintiffs rely on vicarious liability based on the alleged failure of a corrections officer to recognize Laura's need for treatment of depression. Even if the officer should have responded differently to Renart's concern over Laura, Atlantic County is entitled to summary judgment because municipalities are not vicariously liable under § 1983 for the actions of their employees. Connick, 563 U.S. 51, 60 (2011). Likewise, Warden

Geraldine Cohen is entitled to summary judgment because supervisors are liable under § 1983 only for their own constitutional violations. <u>See</u> <u>Jutrowski v. Twp. of Riverdale</u>, 904 F.3d 280, 290 (3d Cir. 2018) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (2009) ("a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution" (emphasis added in <u>Jutrowski</u>.)

    C.   <u>Plaintiffs' Claims under the NJCRA</u>

Plaintiffs brought their constitutional claims under 42 U.S.C. § 1983 and under the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 <u>et seq</u>. "The NJCRA was modeled after § 1983, and "courts in New Jersey have consistently looked at claims under the NJCRA 'through the lens of § 1983,'" thereby construing the NJCRA in terms similar to its federal counterpart. <u>O'Neal v. Middletown Twp.</u>, No. 3:18-CV-5269-BRM-LHG, 2019 WL 77066, at *8 (D.N.J. Jan. 2, 2019) (quoting <u>Samoles v. Lacey Twp.</u>, No. 12-3066, 2014 WL 2602251, at *15 (D.N.J. June 11, 2014) (additional citations omitted)). Here, Plaintiffs have not distinguished their § 1983 and NJCRA claims in any manner. Therefore, the Court concludes that the Atlantic County Defendants are entitled to summary judgment on Plaintiffs' NJCRA claims for the same reasons they are entitled to summary judgment on Plaintiffs' § 1983 claims.

D.    <u>John Doe Defendants</u>

The Atlantic County Defendants request that the Court dismiss the John Doe Defendants because discovery has not revealed their identities and the statute of limitations has expired. Plaintiffs oppose dismissal, stating they still might identify the John Doe Defendants. "[A] court may at any time, on just terms, add or drop a party." Blakeslee v. Clinton Cty., 336 F. App'x 248, 250 (3d Cir. 2009) (citing Fed. R. Civ. P. 21.) A district court does not abuse its discretion when it dismisses John Doe Defendants if discovery does not yield their identities. Id. (citing Scheetz v. Morning Call, Inc., 130 F.R.D. 34, 37 (E.D. Pa. 1990)). Discovery has been completed and Plaintiffs have not described any defendant whose identity they would continue to seek. It is appropriate to dismiss the John Doe Defendants under these circumstances, although dismissal is without prejudice.

E.    <u>Plaintiffs' Remaining State Claims</u>

The only basis for federal court jurisdiction over Plaintiffs' New Jersey wrongful death, survivor action, and negligence claims is supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), which provides:

> In any civil action of which the district courts have original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy ...

23

The statute also provides that "district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if-- … the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C.A. § 1367(c)(3). If a district court decides not to exercise supplemental jurisdiction and therefore dismisses state-law claims, it should do so without prejudice." <u>Kach v. Hose</u>, 589 F.3d 626, 650 (3d Cir. 2009). The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims and dismisses those claims without prejudice.

IV.  CONCLUSION

   For the reasons discussed above, the Court grants summary judgment to Defendants Atlantic County and Warden Geraldine Cohen on Plaintiffs' claims under 42 U.S.C. § 1983 and the NJCRA. The Court dismisses the John Doe Defendants without prejudice, and declines to exercise supplemental jurisdiction over Plaintiff's state law claims.


An appropriate order follows.


Date:  <u>November 27, 2020</u>

                    <u>s/Renée Marie Bumb</u>
                    **RENÉE MARIE BUMB**
                    **United States District Judge**